UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:26-cr-00088-CRB-3 |
| Plaintiff, | **DETENTION ORDER** |
| v. | |
| FRANKLIN JAIR LOPEZ, | |
| Defendant. | |

On March 4, 2026, defendant Franklin Jair Lopez was charged by a Criminal Complaint with aiding and abetting unlicensed firearms dealing in violation of 18 U.S.C. § 922(a)(1)(A) and 18 U.S.C. § 2, during three controlled buys from November 18, 2025 through February 12, 2026.  Dkt. No. 1.  He and a co-defendant made their initial appearances in custody, and at each defendant's appearance the Unites States moved for detention.  Dkt. 4; *USA v. Isaac Gonzales-Chavac*, 3:26-cr-00088-CRB-1, Dkt. 8.  The government was entitled to detention hearings pursuant to 18 U.S.C. § 3142(f)(1)(E) because both cases charged the defendants with felonies that involve the possession or use of a firearm as that term is defined in 18 U.S.C. § 921.

The present Order supplements the Court's findings and order at the March 10, 2026 hearing and serves as written findings of fact and a statement of reasons as required by 18 U.S.C. § 3142(i)(1).

**I.      BACKGROUND**

The Court describes the procedural history of this case, the circumstances surrounding the federal charges against Lopez, and further information concerning his background and conduct in the community.

DETENTION ORDER
3:26-cr-00088-CRB-3

1

Lopez is charged with unlawful firearms dealing by aiding and abetting another person, Isaac Kebin Gonzales-Chavac. Gonzales-Chavac was indicted on the same charge on February 25, 2026 and arrested on March 3, 2026, in Case No. 3:26-cr-00088-CRB-1. Lopez was also arrested on March 3, 2026 during the execution of a federal search warrant on his residence. Dkt. 1 (Aff. in Supp. of Appl. for Arrest Warrant and Criminal Compl. (Affidavit) ¶ 20). Lopez was charged by complaint the following day. The grand jury subsequently returned a superseding indictment naming Lopez as Gonzales-Chavac's co-defendant. Dkt. 16.[1]

On March 9, 2026, the Court heard the government's motion to detain Gonzales-Chavac, and the next day it heard the motion to detain Lopez. In each case Pretrial Services prepared and submitted a confidential Pre-Bail Report, filed under seal, in which Pretrial Services concluded that the defendant should not be detained because special conditions could be imposed that would reasonably assure the appearance of the defendant as required and the safety of any other person and the community. In each case the government submitted a Memorandum in Support of Detention. Dkt. No. 7 (Detention Memorandum); *Gonzales-Chavac*, 3:26-cr-00088-CRB-1, Dkt. 11. The Court ordered Gonzales-Chavac released. The next day, the Court ordered Lopez detained.[2]

The charges against Lopez and Gonzales-Chavac stem from three controlled buys on November 18, 2025, December 9, 2025, and February 12, 2026. During these buys, an undercover officer from the Daly City Police Department purchased a total of six firearms from Gonzales-Chavac. Per the Criminal Complaint's supporting Affidavit, and as restated in the government's memorandum, Lopez was spotted by law enforcement agents at the controlled buys on December 9 and February 12 engaging in countersurveillance, and he was believed to have been present on November 18 given that the same car present on December 9, a Nissan Altima, was in the area on November 18. The government proffered that Lopez was the source of some of these firearms because their images were found on Lopez's phone. Observations during the surveillance operations and the search of Lopez's residence also supported the

---

[1] Lopez's older brother was previously misidentified as having been involved in the alleged illegal firearms dealing and included in the original indictment with Gonzales-Chavac. Affidavit ¶ 20. Agents learned, however, that Lopez's older brother was in custody during the time period in which the three controlled buys occurred. Aff. ¶ 20.

[2] Following the detention hearing, the government filed a proposed detention order. This order incorporates portions of the proposed order but does not adopt it in its entirety.

DETENTION ORDER                                                          2
3:26-cr-00088-CRB-3

government's contention that Lopez was the source of the firearms that Gonzales-Chavac sold. The Complaint's supporting Affidavit contained the following details regarding each of the three buys, as well as Lopez's federal arrest:

**A.      November 18, 2025 Buy**

On November 18, 2025, an undercover agent conducted a controlled purchase of a fully automatic AR-style pistol in Daly City, California from Gonzales-Chavac with Lopez's apparent assistance. Aff. ¶¶ 23-29. The affiant attested that Lopez was in the vicinity of the buy and had contact with Gonzales-Chavac before and after the sale. Specifically, Gonzalez-Chavac was identified as the driver of a gray Ford Fusion, and Lopez was believed to be the driver of a Nissan Altima. The Altima was registered to Lopez's brother, though agents later learned that that brother was in custody on the date of this controlled buy. The person driving the Nissan Altima was wearing a balaclava face mask, so his face was not visible, but based on the affiant's training and experience, and based on his observations, the affiant later came to believe that Lopez was engaged in countersurveillance to assist Gonzales-Chavac.

Before the controlled purchase occurred, the undercover agent reached out to Gonzales-Chavac via WhatApp to coordinate the purchase of a firearm, agreeing upon a date, time, and place. On or about 6:00 pm Gonzales-Chavac drove in the Ford Fusion to the parking lot of the predetermined meeting place in Daly City. At about 6:30 pm, he exited the Ford Fusion, and he was observed on his phone, looking for someone or flagging down someone in the parking lot. Gonzales-Chavac returned to his Ford Fusion. Surveillance units then observed the Nissan Altima parked two spaces from the Ford Fusion. A person, later believed to be Lopez, exited the Nissan Altima and spoke with Gonzales-Chavac who had exited from the Ford Fusion.

Shortly thereafter Gonzales-Chavac met with the undercover agent at that predetermined location, and Gonzales-Chavac sold the firearm in exchange for funds. The undercover agent exited the Ford Fusion, and Gonzales-Chavac departed from the predetermined location in the Ford Fusion and met back up with the driver of the Nissan Altima, believed to be Lopez.

**B.      December 9, 2025 Buy**

On December 9, 2025, law enforcement conducted another controlled purchase from Gonzales-

DETENTION ORDER                                          3
3:26-cr-00088-CRB-3

Chavac, where Lopez was again involved in assisting the sale.  Aff. ¶¶ 31-39.  As before, an undercover officer communicated with Gonzales-Chavac via WhatsApp messaging to coordinate the purchase of firearms, specifically a privately made AR-style pistol and Glock 20, at a predetermined location in Daly City.

On the day of the purchase, before the actual purchase itself, law enforcement surveilled Lopez.  At about 10:00 am, the Nissan Altima was located at an address in San Franciso.  Lopez and another individual were observed exiting a residence and entering into the Nissan Altima.  The person with Lopez was seen carrying an ammunition can and a black backpack, which appeared heavy, and which were brought into the Altima.

Law enforcement followed the Nissan Altima to Lopez's residence.  At approximately 11:22 am, Lopez was observed walking from the Nissan Altima toward the garage of his residence, bringing the black backpack and ammunition can into the residence.  Lopez was observed making phone calls and texting before walking up a set of stairs to the front entrance of the residence.  Lopez then walked down the same set of stairs at the residence, and the garage door opened.  Lopez appeared to remove an item from the backseat of the Nissan Altima, hide it in his jacket, and then walk into the residence via the open garage.

At about 12:55 pm, mobile surveillance units observed Lopez and the other individual exit Lopez's residence and enter the Nissan Altima.  Lopez was observed carrying a large orange backpack into the vehicle and the other individual was seen carrying a black and gray pistol safe with a key inside its lock.  Mobile surveillance followed the Nissan Altima driven by Lopez to a location in the same area where the undercover agent and Gonzales-Chavac had arranged for the agent to purchase for firearms.  Gonzales-Chavac arrived at the location in a Ford Fusion that bore the same license plate as the Ford Fusion he used during the November controlled buy.  Gonzales-Chavac was observed meeting with Lopez and the other individual.  All three individuals were observed sifting through a backpack while seated in the Nissan Altima.  Eventually Gonzales-Chavac and the other individual departed in the Ford Fusion to the nearby location to meet the undercover agent.

Gonzales-Chavac exited the Ford Fusion with the orange backpack that Lopez had previously taken from his residence into the Nissan Altima.  Gonzales-Chavac and the undercover agent exchanged

a predetermined amount of U.S. currency for the two firearms.  Gonzales-Chavac gave the undercover agent the AR-style pistol from inside of the orange backpack.  Gonzales-Chavac also gave the undercover agent the Glock 20 inside the same gray pistol safe previously observed in the other individual's hands when he was with Lopez earlier in the day.  At the time Gonzales-Chavac gave the undercover agent the gray pistol safe containing the Glock 20, it was inside the same orange backpack.  After the exchange, Gonzales-Chavac was observed placing the money from the undercover agent into his front right pocket and ultimately providing some to the other individual.  Gonzales-Chavac, Lopez, and the third individual then reconvened and were observed standing outside and talking to one another, and the surveillance units followed Lopez and the other individual back to the residence on Head Street.

### C.    February 12, 2026 Buy

On February 12, 2026, law enforcement conducted another controlled gun buy from Gonzales-Chavac with Lopez's assistance.  Affidavit ¶¶ 40-45.  Three firearms were sold: a privately manufactured AR-style pistol, privately manufactured Polymer80 pistol, and a Quiet Riot Firearms QRF-15 AR-style pistol (#QRF0236).  The same undercover agent who conducted the November and December controlled buys, a Daly City police officer, conducted the February buy.  Prior to this controlled purchase, the undercover agent reached out to Gonzales-Chavac via WhatsApp messaging, to coordinate the purchase of the firearms with him.  A date, time, and place were agreed upon, and Gonzales-Chavac sent photos of the firearms to be purchased.

On the day of the purchase, Gonzales-Chavac arrived at the planned location in a white Kia SUV and parked a few parking spots away from the UC's vehicle.  At the same time, Lopez arrived, driving a gray Ford Fusion, bearing a different license plate number from what appeared on the Ford Fusion at the prior controlled buys.  Lopez was accompanied by another individual seated in the front passenger seat.  Lopez parked the Ford Fusion perpendicular to Gonzales-Chavac's Kia SUV, and waited inside of the Ford Fusion for the duration of the controlled purchase.

Gonzales-Chavac exited the SUV with a red Nike duffel bagged, walked to the undercover agent's vehicle and entered the passenger side.  Gonzales-Chavac and the undercover agent exchanged a predetermined amount of currency for three firearms.  Gonzales-Chavac then told the undercover agent that he had to give the money he had just received for the firearms to his friend.  Gonzales-Chavac was

then seen exiting the passenger seat of the undercover agent's vehicle, walking over to the Ford Fusion driven by Lopez, and handing him the money through the open passenger side window. Gonzales-Chavac then reentered the undercover agent's vehicle for a short conversation and then left the undercover agent's vehicle for the final time that day. The undercover agent left the buy location and returned to a predetermined location.

### D.    March 3, 2026 Search Warrant at the Residence at Head Street

On March 3, 2026, law enforcement agents executed a federal search warrant at Lopez's residence in San Francisco, where they gathered more evidence of firearms and Lopez's involvement. Aff. ¶¶ 46-50. Inside the residence, agents discovered two additional privately manufactured firearms—an AR-style pistol and a short barreled rifle with fully automatic fire capability that allowed it to function as a machine gun.

These firearms were the same two firearms that Gonzales-Chavac offered to the undercover agent in the days before the execution of the search warrant. Gonzales-Chavac had sent a video of one of the firearms to be purchased. Other residents of the home confirmed that the room where the firearms were found belonged to Lopez and the bed under which firearms were found was his bed. All residents denied having any knowledge that the firearms were there, and stated that none of them owned or possessed those firearms. Furthermore, the bed in Lopez's bedroom had the same bedsheets that were in the background of the photos and/or videos sent by Gonzales-Chavac of several firearms that he offered for sale. Lopez's bedroom also had the patterned area rug that was in the background of the photos and/or videos sent by Gonzales-Chavac of several firearms that he offered for sale.

Following Lopez's arrest on March 3, 2026, the same Daly City police officer who conducted the controlled buys, as well as two other officers involved in the investigation, identified Lopez as the person seen assisting Gonzales-Chavac. Aff. ¶ 21.

### E.    Additional Government Proffers

The government made additional proffers in its Detention Memorandum based on Lopez's Mirandized interview; the contents found on his phone, which was seized and searched upon his arrest; and other investigative efforts. During the interview, Lopez initially denied involvement but later admitted to his presence at each of the controlled buys. Furthermore, the government pointed to an

earlier arrest of Lopez on November 19, 2025. At that time, a loaded, semi-automatic pistol was found in the Nissan Altima that Lopez was driving. Lopez was charged with two felonies in San Francisco Superior Court—one for carrying a loaded firearm in public and another for having a concealed firearm in a vehicle. After Lopez spent two days in custody due to the state arrest, he was released subject to the condition that he not possess weapons. He was then involved in the December 2025 and February 2026 controlled buys, as described in the affidavit summarized above.

The government cited to photos and screenshots of video to show a significant volume of firearms offered for sale, as well as their lethality. Dkts. 7-1, 7-2. The government also proffered that ballistics testing of the six firearms that Lopez gave to Gonzales-Chavac to sell show that three of the firearms were connected with other crimes.

The government asserted that Lopez has been the source of many of the firearms offered for sale through Gonzales-Chavac's WhatsApp account, relying upon photos and videos that law enforcement agents uncovered on Lopez's phone, as well as the firearms found under Lopez's bed.[3] Dkt. 7 at 11-12, Dkt. 7-2. A distinctive patterned rug was found in Lopez's room which was the background for several firearms offered for sale by Gonzales-Chavac, creating a strong inference that Lopez had possessed those firearms and was sending the photos of them to Gonzales-Chavac, who would then forward those photos to law enforcement in offering those firearms for sale. Per the government's proffer, many of the same firearms, and even the same photos, were found on defendant Lopez's phone seized from him incident to his arrest on March 3.

Relying on material found in Lopez's phone, the government proffered that Lopez has engaged in other conduct that poses a danger to the community, separate and apart from the charged violations. Citing video clips and photos from February and March 2026, prior to his federal arrest, the government asserts that Lopez and his friends and associates engaged in very troubling behavior as they drove around the community. In one video, Lopez is filming himself and the passengers in the car, and when he turns the camera to the backseat, one of the passengers pulls down the shirt of a woman who appears

---

[3] The government did not make any similar proffers in its memorandum in support of detaining Gonzales-Chavac. There was no representation that Gonzales-Chavac was the source of the guns, or that a search of his residence uncovered firearms, narcotics or the proceeds from such sales.

DETENTION ORDER
3:26-cr-00088-CRB-3

to be passed out in the back and fondles her breast for the camera. Lopez appears to laugh and express approval. In another video taken by Lopez, Lopez appears to abruptly and without any provocation slap the face of a young boy sleeping on him, seemingly to entertain others. In another video, the government asserts Lopez films himself driving a car with his associates in it, and then films one of them jump out, assault a random individual at a Cal-Train station in San Francisco, and then return to the car to be driven off by Lopez. The government points to one video showing him flash a significant sum of money on the same day as the last controlled gun buy in February 2026.

Finally, the government points to other instances in which Lopez has had contact with law enforcement. Per the Pre-Bail Report, Lopez had an arrest for robbery as a juvenile on December 9, 2024. The government also proffered that, when Lopez's brother was arrested on September 9, 2025, for having a gun in a backpack located in the car being driven by the brother, Lopez arrived on scene and indicated the backpack was his. Because Lopez was still a juvenile at the time, police believed this was an attempt to mislead them because juveniles know they often face less serious consequences than adults, which defendant Lopez's brother was at that time.

**F.     Other Information Concerning Lopez's Background**

Pretrial Services' Pre-Bail Report indicated that Lopez is 18 years old and lives with his mother, stepfather, his two minor siblings and stepfather's family. Lopez's mother, who is employed, was offered by Lopez as his custodian and surety should the Court release him. She attended her son's detention hearing.

Lopez has lived in San Francisco been since 2019. The Pre-Bail Report indicated that he and his mother had asylum applications pending, though at the detention hearing, counsel indicated that the applications had been approved in the fall of 2025. The Court noted that a pending asylum application, after a period of time, and asylum status itself, both afford an opportunity to work legally within the United States. *See* 8 C.F.R. §§ 274a.12(a)(5), (c)(8). The Pre-Bail Report noted that Lopez had previously worked at a grocery store alongside his mother for five months, and that he is a high school student.

The Pre-Bail Report indicated that Lopez is in good physical condition and presents no mental infirmities, although he reported steady drug and alcohol use that Pretrial Services considered to be an

DETENTION ORDER
3:26-cr-00088-CRB-3

8

aggravating factor.  Lopez reported that he had tried to quit using marijuana in the past and that he was willing to participate in substance use treatment.  Information concerning Lopez's juvenile criminal history is limited due to state law restrictions, and the only information indicates a 2024 arrest for robbery.  The Pre-Bail Report also indicated Lopez's November 19, 2025, arrest.

After his November arrest Lopez enrolled at a high school designed to provide educational services to struggling students.  Lopez proffered a social worker from the school who has been assisting Lopez and is willing to continue to work with him to improve defendant Lopez's behavior.  Several staff from the school appeared at the hearing to convey their willingness to partner with Lopez and support him.  Prior to his enrollment at the specialized high school, Lopez was enrolled at Lincoln, a comprehensive public high school.  No staff or teachers from Lincoln appeared on Lopez's behalf.  No proffers were made concerning other Lopez's pro-social activities, despite the court's inquiries regarding any involvement that he may have had in sports or other opportunities.

## II.    LEGAL STANDARD

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  A finding that a defendant is a flight risk needs only be supported by a preponderance of the evidence.  *Id*.  A finding that a defendant is a danger to the community must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f)(2)(B).  "[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in § 3142(g)."  *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019).  Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible.  *Id*.  Consideration of factors outside those articulated in § 3142 is also disfavored.  *Id*.  Thus, in deciding whether to detain the defendant pretrial, the Court considers the following four factors set forth in § 3142(g):

> (1)    the nature and circumstances of the offense charged . . . ;
>
> (2)    the weight of the evidence against the person;

DETENTION ORDER
3:26-cr-00088-CRB-3

> (3)    the history and characteristics of the person, including—
>
>> (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see* also *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

## III.    ANALYSIS OF FACTS PRESENTED AT THE DETENTION HEARING

Both parties submitted oral argument and proffers at the hearing. The following is an analysis of the facts that were presented to the Court during the hearing that are pertinent to the § 3142(g) factors.

### A.    The Nature And Circumstances Of The Offense Charged

The facts presented show that this factor weighs in favor of detention. While Lopez is not accused of committing acts of violence with any firearms or using them at all, the nature of the firearms and Lopez's consistent involvement over the course of months as a conduit and facilitator for the sale of such weapons presents a serious danger to the community. The increased prevalence of unregulated firearms within the community heights the risk of violence. Furthermore, Lopez appears to have taken a stronger role in the commission of the alleged crime, compared to Gonzales-Chavac. Thus, the nature and circumstances of the offense weigh in favor of detention.

### B.    Weight Of The Evidence Against The Defendant

This factor weighs in favor of detention, but the Court notes "the weight of the evidence is the least important of the various factors." *Motamedi*, 767 F.2d at 1408. As noted in the Affidavit, however, Lopez was initially misidentified as his older brother; he was identified as the person engaged in the above acts after Lopez was arrested on March 3. On that record alone, the evidence against him could be considered weak. But considering the totality of the evidence, including, among other things, the photo and video evidence found on Lopez's phone, the rifles located under his bed, and his connection to the Nissan Altima, this factor provides support in favor of his detention.

The Court notes that the mere presence of a significant number of photos of firearms on Lopez's phone does not establish that he had possession, custody, or control of them, or the ability to access all of them to assist in selling them. However, the photos in combination with the other evidence discussed above strongly indicate that Lopez was endeavoring to bring firearms into the community to make them available for sale and he was able to facilitate such transactions in a series of controlled buys.

**C.      The History And Characteristics Of The Person**

**1.      The Person's Character**

Lopez has established his longstanding presence in this community, relative to his age, and his familial ties to San Francisco. However, the law enforcement affidavit and the government's proffers raise serious concerns regarding Lopez's behavior and the extent to which his conduct poses a danger to the community. Lopez's youth, patterns of substance use, his recent prior arrests and contact with law enforcement, as well as the video recordings showing his and his associates' behavior, taken together and alongside the firearms-related charges, demonstrate a serious risk of danger to the community.

Furthermore, given his immigration status, Lopez had a pathway to lawful employment and further integration into the social and economic fabric of the community. Lopez also had the opportunity to learn from his older brother's arrest and to utilize the resources and support available through his high school. Evidently, Lopez did not lean into these opportunities and lessons.

**2.      Whether the Person Was on Release**

The government has also proffered that, even though he just turned eighteen last October, Lopez had already been arrested as an adult on November 19, 2025— i.e., the day after the first controlled buy—for possessing a loaded firearm under the driver seat of the car he was driving. After two days in custody, he was arraigned on felony charges in San Francisco Superior Court and released on his own recognizance with an order not to possess firearms. And yet, following this arrest, short custodial stint, and condition of release, Lopez still possessed and dealt many firearms per the conduct charged in this case.

Lopez's history of conduct and the timing of his arrest weigh in favor of his detention.

DETENTION ORDER                                11
3:26-cr-00088-CRB-3

**D.      Risks Associated with Release and Whether Release Conditions Will Reasonably Mitigate the Risks**

The undersigned has considered whether release conditions could mitigate the risks of danger that have been identified.  Here, the risk of danger consists of the influx of unlicensed, high-power handguns and rifles into our dense, urban community.  The release conditions recommended to mitigate these risks included, among other provisions, imposing a $20,000 unsecured bond, releasing Lopez to reside at home with his mother, requiring his mother to report to Pretrial Services any violation of a release condition, and proscribing his use of alcohol and controlled substances.

As discussed above, Lopez has already demonstrated his unwillingness to abide by a court's pretrial release order.  He disregarded the state court order not to possess firearms when law enforcement agents observed him transporting firearms in advance of Gonzales-Chavac's controlled sale to an undercover agent.  Lopez, at the hearing, showed that he had strong community support and a social worker to improve his life—much of which appears to have happened about 3-4 months ago, which is around the time of his November 19 arrest.  But Lopez's further involvement with two controlled gun buys since November 2025, the firearms located under his bed, and the video recordings on his phone undermine his credibility.  Lopez's apparent lack of engagement in prosocial activities and networks typical for most teenagers his age creates significant doubts that release conditions would be sufficient to assure the public's safety to a reasonable extent.  The Court also doubts Lopez's mother's ability to serve effectively as a custodian, given that his prior problematic conduct allegedly occurred while he resided at her home and given her elder son's arrest and detention.

## IV.     CONCLUSION AND ORDER

The government has demonstrated by clear and convincing evidence that there is no condition or combination of conditions that could be imposed on Lopez that would reasonably assure the public's safety.  The Court's determination in this regard is limited, as it is reached as part of the expedited proceedings that are established for pre-trial detention motions.  The undersigned's determination does not address factors such as remorse or a person's capacity to be rehabilitated, if the allegations are in fact proven beyond reasonable doubt.  If further investigation into the allegations reveals that law enforcement agents again misidentified the suspected perpetrator of the charged crimes or other new

information emerges that materially bears on the issue of whether Lopez should be released under the Bail Reform Act, Lopez may seek to reopen the detention hearing.  *See* 18 U.S.C. § 3142(f).

Pursuant to 18 U.S.C. § 3142(i), IT IS HEREBY ORDERED THAT:

1.    Defendant Lopez be, and hereby is, committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2.    Defendant Lopez be afforded reasonable opportunity for private consultation with counsel; and

3.    On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which Defendant Lopez is confined shall deliver the defendant to an authorized United States Marshal for the purpose of any appearance in connection with a court proceeding.

IT IS SO ORDERED.

DATED: April 6, 2026

_____
HON. LISA J. CISNEROS
United States Magistrate Judge

DETENTION ORDER
3:26-cr-00088-CRB-3

13